No. 22,900.

THE STATE OF KANSAS, *Appellee,* v. MIKE ROSELLI, *Appellant.*

SYLLABUS BY THE COURT.

1. HOMICIDE—*Robbery—Information Charged Murder in the First Degree Without Stating It Was Committed in Perpetration of Robbery.* The defendant and a companion entered a merchant's store, and proceeded to rob him. While the robbery was in progress, the defendant's companion shot and killed the merchant. *Held,* it was permissible to charge the defendant with murder in the first degree, by an information in the common form, without stating the murder was committed in perpetration of robbery.

2. SAME—*Evidence Proved Charge in the Information.* Evidence showing the murder was committed in perpetration of robbery sustained the allegations of the information.

3. SAME—*Not Necessary to Allege Conspiracy to Rob or Murder.* It was not necessary the information should charge conspiracy between the defendant and his companion to rob or to murder.

4. SAME—*Murder in Connection with Robbery.* Robbery is a crime of violence used or threatened. It is a matter of common knowledge, derived from human experience, that a display of personal violence to accomplish robbery normally tends to the taking of life; and if, in execution of a common purpose of two persons to rob, one of them murder the victim, the other is guilty of murder.

5. SAME—*Cross-examination of Accused—On Subjects Involving Him in Degradation and Disgrace.* On cross-examination of the defendant, who was a witness in his own behalf, he was properly interrogated with respect to (a) subjects embraced in his direct examination; (b) the subject of his own criminal record; (c) the subject of his relation to robbers and other criminals who made his place of employment their rendezvous; and (d) subjects involving him in degradation and disgrace, although not pertaining to the robbery and homicide for which he was on trial, and although pertaining to the commission of other crimes.

6. SAME—*Evidence of Reputation of Defendant's Place of Business.* In rebuttal, evidence was offered and received relating to the reputation of the defendant's place of employment. The purpose was to smirch the character of the defendant with the character of the place where he worked, although he had not placed his character in issue. *Held,* error.

7. SAME. The evidence referred to was too weak to accomplish its purpose. *Held,* the error was not prejudicial.

3—109 KAN.

8. SAME—*No Instruction Relative to Murder in the Second Degree Required by the Evidence.* The defense was that, when the merchant was robbed and killed, the defendant was at work at the place of his employment in Kansas City, Mo. The evidence was conclusive that, if he were present when the crime was committed, he and his companion were engaged in robbery. *Held,* a request for an instruction relating to murder in the second degree was properly denied.

9. TRIAL—*Assignments of Error Without Merit.* Minor assignments of error considered, and held to be without substantial merit.

Appeal from Wyandotte district court, division No. 2; FRANK D. HUTCHINGS, judge. Opinion filed May 7, 1921. Affirmed.

*James L. Hogin,* and *Roy R. Hubbard,* both of Kansas City, for the appellant.

*Richard J. Hopkins,* attorney-general, *E. A. Enright,* county attorney, and *J. N. Baird,* assistant county attorney, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The defendant was convicted of murder in the first degree, and appeals.

On the evening of March 18, 1919, as C. P. Jehu was preparing to close his grocery store in Kansas City, Kan., George Becker rushed in at the front door, flourishing a revolver, and said, "Stick them up, boys; no fooling; we mean business." Several persons were in the store, and Becker's command was obeyed by all except Jehu. Jehu had just taken money from the cash register and put it in a sack, which he placed in his sweater pocket. Becker went toward him, and as he retreated to the rear of the store, Becker shot him twice. While Becker was moving toward Jehu, the defendant entered the store, flourishing a revolver. He covered the persons who had their hands up, searched a man standing by the stove near the center of the store, and then went to the place where Jehu was lying. Meanwhile, Becker returned to the cash register. There was evidence the defendant struck Jehu, who was still alive, on the head with a revolver, and took the sack of money from Jehu's pocket. Becker asked the defendant if he had the money, and the defendant said yes. The two then backed out of the store,

went up the street, and entered a waiting automobile. The defense was that, when the killing occurred, the defendant was at work at 614 Independence avenue, Kansas City, Mo., where he was regularly employed. There was evidence no marks were found on Jehu's head, and there were some slight discrepancies in the evidence relating to some of the details of the event. There was, however, ample evidence to identify the defendant as Becker's companion, and the state's evidence left no room for any doubt about the material facts of the robbery and homicide.

The information charged a malicious, willful, deliberate, premeditated killing by Becker and the defendant, without stating the murder was done in perpetration of robbery, and it is said proof of killing in perpetration of robbery did not correspond to the allegations of the information.

The sections of the statute relating to the crime of murder follow:

"Every murder which shall be committed by means of poison or by lying in wait, or by any kind of willful, deliberate and premeditated killing, or which shall be committed in the perpetration of an attempt to perpetrate any arson, rape, robbery, burglary, or other felony, shall be deemed murder in the first degree.

"Every murder which shall be committed purposely and maliciously, but without deliberation and premeditation, shall be deemed murder in the second degree.

"Persons convicted of murder in the first degree shall be punished by confinement and hard labor in the penitentiary of the state of Kansas for life. Those convicted of murder in the second degree shall be punished by confinement and hard labor for not less than ten years." (Gen. Stat. 1915, §§ 3367, 3368, 3369.)

On numerous occasions this court has adverted to the fact that the statute does not define murder, and that the basis of the legislation is murder at common law. For purpose of punishment murder is divided into two degrees, depending on presence or absence of deliberation and premeditation. Every murder committed by any kind of willful, deliberate and premeditated killing, is murder in the first degree. Use of poison, lying in wait, and killing in perpetrating or attempting to perpetrate arson, rape, robbery, burglary, or other felony, are statutory equivalents for the deliberation and premeditation essential to murder in the first degree. All other murders are murders in the second degree.

The code of criminal procedure requires an information to be definite and certain respecting the crime charged, and requires a statement of the facts constituting the offense. There is no substantial dispute in the authorities that, under a crimes act of the character described, these requirements are satisfied by pleading murder in the first degree in the common form. Deliberation and premeditation are ultimate facts. When alleged they denote murder in the first degree, and they may be established by proof of murder committed in perpetrating a felony, without pleading the particulars. Cases are collated in 10 Encyc. Pl. & Pr. 150, note 5; 2 Supp. Encyc. Pl. & Pr. 636; 21 Cyc. 870, notes 82 and 84; 63 L. R. A. 393, note. Later cases discussing the principle are: *State v. Barrington,* 198 Mo. 23; *People v. Friedman,* 205 N. Y. 161; *People v. Patini,* 208 N. Y. 176; *Holmes v. State,* 6 Okla. Crim. 541; *Turner et al. v. State,* 8 Okla. Crim. 11; *State v. Farnam,* 82 Ore. 211.

In the case of *The State v. Keleher,* 74 Kan. 631, 87 Pac. 738, it was said:

"Proof that a homicide was committed in the perpetration of a felony is held tantamount to the premeditation and deliberation which otherwise would be necessary to constitute murder in the first degree." (p. 635.)

The defendant says the information did not charge a conspiracy between the defendant and any one else to rob or kill Jehu, and without such a pleading the defendant could not be convicted of murder on evidence showing Becker did the killing. It was not necessary to plead conspiracy in terms. (*The State v. Mullins,* 95 Kan. 280, syl. ¶ 2, 147 Pac. 828; 16 C. J. 647, § 1284.) All participants in a crime are equally guilty, without regard to the extent of their participation. It was sufficient to charge directly those concerned with the crime, and if, in execution of a common purpose to rob, one of them did the killing, the other would be guilty of murder.

The defendant was a witness in his own behalf. He came to Kansas City, Mo., from Denver, Colo., on the last day of December, 1918, and worked at 614 Independence avenue until he was arrested in April, 1919. The place was a cigar store, with tables for card playing, and the defendant had charge of cigar, sandwich, and candy cases. He said he was twenty years old at the time of the trial, and his name was Mack Roselli, but he had always gone under the name of Mack Ross. He

came to Kansas City with Carl West. West was arrested in February, 1919, for beating to insensibility and then robbing a man named Peterfreund, in Kansas City, Kan., and was lodged in jail in that city. The defendant visited him while he was in jail. George Casey was implicated in the Peterfreund robbery, and the defendant was with Casey when the latter was arrested. Casey's sister and Casey's "girl" told the defendant he had better get away, and Luke Maturi advised him to leave, but he did not go. The defendant was arrested in Missouri, and was identified in the show-up room in the Kansas City, Mo., police station. The defendant testified that a police officer, who was present at the time, said of him, "This is Mike Roselli, known as Cokey Mike, all over, to the police, and he is wanted in Kansas." The defendant had a friend, Ross Bonuri, who was implicated in the Peterfreund robbery. The two were in the Missouri police station together, and were brought to Kansas at the same time. When first brought to Kansas the defendant was held in the Kansas City police station. While there an officer inquired if he knew Becker. The defendant denied acquaintance with Becker, and the officer then said, "Don't you know him, he killed a man in St. Louis and one here in Kansas City."

On cross-examination the defendant was asked if he did not, while in Denver, sell cocaine, procured by acting as a fence, and if he did not acquire the cognomen of Cokey Mike from that fact. He was asked if he had not been convicted of robbery in Colorado and confined in a reformatory there, if he had not been paroled, and if he did not break his parole. To all these questions negative answers were returned. The defendant's alibi rested on his own and other testimony that he worked every day from 5:30 p. m. until midnight at 614 Independence avenue. He met Casey, Bonuri, and others implicated in the Peterfreund robbery and other crimes, at that place. Searching inquiry was made respecting his association with these criminals, and questions were asked indicating that the place was their rendezvous. The defendant did not admit knowledge of the Peterfreund robbery, on the night it occurred. He did admit that those who committed the crime set out from 614 Independence avenue, and afterwards all came in together, "one night." He denied knowledge of the fact that Becker

had killed and robbed a druggist and was in the penitentiary. He said Mabel Trimble was "a girl" of his. He was asked if she were not the wife of another man, and he said he did not know. He was then asked if he did not solicit her to go on the street as a streetwalker and obtain money for him. The record does not disclose an answer to the question.

Objection was made to the greater part of the cross-examination which has been outlined. The defendant introduced the subject of names by which he was known, and cross-examination in respect to that matter was proper. The other subjects were all proper subjects of cross-examination. The defendant's own criminal record, if he had one, and his relation to a gang of criminals of the beating, killing, robbing type, who frequented his place of business, were open to inquiry. If the imputations respecting the Trimble woman were true— and the questions regarding the matter were evidently propounded in good faith—the defendant was too despicable to be worthy of belief. The purpose of the cross-examination was to discredit the defendant's testimony by discrediting him. To that end he might be required to give answers which would degrade and disgrace him, although not pertaining to the robbery and homicide for which he was on trial, and although pertaining to the commission of other crimes. This rule of criminal evidence was carefully considered in the case of The State v. Pfefferle, 36 Kan. 90, 12 Pac. 406, and has been applied in a long line of subsequent cases, extending to that of The State v. Bowers, 108 Kan. 161, 194 Pac. 650. The defendant relies on such cases as The State v. Boyland, 24 Kan. 186; The State v. Kirby, 62 Kan. 436, 63 Pac. 752; and The State v. Wheeler, 89 Kan. 160, 130 Pac. 656. In the Boyland case, the prosecuting witness testified to shameful words and deeds of the defendants, said and done several days after the alleged offense. In the Kirby case, the defendant's wife was cross-examined in reference to other and distinct offenses committed by the defendant, not by the witness. In the Wheeler case, the state as a part of its case in chief produced evidence tending to prove offenses by persons with whom it was not shown the defendant had associated or conspired. Cases such as these have no application whatever to cross-examination of a defendant who offers himself as a witness.

In the course of the defendant's cross-examination some questions were propounded which were not warranted by the rule just discussed. They were not of sufficient importance to be harmful. The county attorney, however, transgressed the limits of propriety in offering, and the court committed error in receiving, evidence on the part of the state in rebuttal, relating to the reputation of the place referred to as 614 Independence avenue. The purpose was to smirch the character of the defendant with the bad character of the place where he worked. The state was bound by the defendant's answers, given on cross-examination, unless and until he placed his character in issue. He did not place his character in issue, and the state had no right to make a general attack on it. The judgment would be reversed because of this error, if it were not for the fact the evidence did not aid the state's case. The place was frequented chiefly by Italians. "The boys" played cards there. Although the reputation of the place was not very good, it was not any worse than many others in the city, and the place had never been raided. Some of the perpetrators of the Peterfreund robbery were arrested there. This being the substance of the evidence, it cannot be said the error resulted in substantial prejudice to the defendant's rights.

Complaint is made that the court refused an instruction to the jury on the subject of conspiracy. The jury was properly instructed according to the theory of the information which has been approved.

In the instruction given relating to the defendant's responsibility for killing done by Becker, the court said in effect that if, in execution of a common intent and purpose of the defendant and Becker to rob Jehu, Becker killed Jehu, the defendant would be guilty of murder in the first degree if, when tested by human experience, a natural and probable result of the robbery would be the taking of human life. Complaint is made because the court used the expression "when tested by human experience." It is said the jury were not told to use knowledge and experience they possessed in common with mankind, but were invited to resort to the abstract thing, "human experience." The complaint is hypercritical. The meaning of the instruction was the same as though the expression had been omitted. If the expression had been omitted, the instruction would have

been in the common form, when probable outcome of a felonious enterprise is to be considered. Robbery is a crime of violence used or threatened. It is a matter of common knowledge, derived from human experience, that a display of personal violence to accomplish robbery normally tends to the taking of life, and under the evidence in this case the jury could make no mistake about it.

Complaint is made that the court refused to instruct the jury with reference to murder in the second degree. There was no evidence on which to base such an instruction. The defendant was either present and participated in the robbery, or he was at 614 Independence avenue in Kansas City, Mo. If in Missouri, he was entitled to a verdict of acquittal. If in Jehu's store, he was engaged in perpetrating the robbery in which the murder was committed, and that deliberation and premeditation which must be utterly absent in second-degree murder was incontestably present. It is true that generally a charge of murder in the first degree in the common form will include a charge of murder in the second degree, and the court must instruct the jury on all matters of law necessary for its information in returning a verdict; but the court is not required to instruct with reference to a lesser degree unless there be evidence warranting a reasonable inference of guilt in that degree. In this instance there was no opportunity for even capricious acceptance and rejection of evidence by the jury in such a way as to leave a residuum on which to predicate murder in the second degree. Every person in Jehu's store who survived the robbery gave an account of it which made the defendant guilty of murder in the first degree, and the court was not authorized to license the jury to indulge in speculation leading to a conclusion not justified by the evidence.

An argument is made relating to proof of guilt of a principal in the first degree, before a principal in the second degree may be convicted, based on the following statutes:

"Every person who shall be a principal in the second degree in the commission of any felony, or who shall be an accessory to any murder or other felony before the fact, shall upon conviction be adjudged guilty of the offense in the same degree and be punished in the same manner as herein prescribed with respect to the principal in the first degree.

"Any person who counsels, aids or abets in the commission of any offense may be charged, tried and convicted in the same manner as if he were a principal." (Gen. Stat. 1915, §§ 3332, 8029.)

The purpose of these statutes was to get rid of the subtle common-law distinctions between principals in the first and second degrees and accessories, and to permit trial and punishment of participants in a crime independently of each other. (*The State v. Bogue*, 52 Kan. 79, 34 Pac. 410.) It was not necessary that Becker be tried and convicted before the defendant could be placed on trial, and in the defendant's trial order of proof was not important.

It is argued that because the defendant was charged jointly with Becker, he was entitled to be tried jointly with Becker, unless he chose to demand a separate trial. The statute gives the court control over the subject, unless a separate trial be demanded, in which event the defendant requiring it shall be granted a separate trial. (Gen. Stat. 1915, § 8139.) An article of clothing worn by Jehu when he was shot was properly introduced in evidence. Instructions relating to malice and to deliberation and premeditation did not confuse the two subjects. A misstatement in argument by the county attorney of the penitentiary of which West was an inmate was not a serious matter. The county attorney's characterization of 614 Independence avenue and of its habitués had a basis in the evidence, and the jury was able to distinguish between fact and argumentative extravagance. The defendant and Becker used an automobile in departing from the scene of their crime, and the county attorney's comments on use of high-powered motor cars by assassins rushing out from 614 Independence avenue, had a relation to the case, though somewhat "high-powered."

The judgment of the district court is affirmed.